Filed 11/16/21  P. v. Peterson CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B308499 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. SA101383) |
| v. | |
| SEAN PETERSON, | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Lauren Weis Birnstein, Judge.  Affirmed in part and reversed in part; remanded for further proceedings.

David R. Greifinger, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Paul R. Roadarmel, Jr. and Allison H. Chung, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found Sean William Peterson guilty of making and attempting to make criminal threats and misdemeanor brandishing a deadly weapon, with true findings on hate crime allegations. Peterson appeals, claiming the evidence was insufficient to support his conviction for attempted criminal threats, the court committed instructional error, and his probationary terms must be reduced in light of Assembly Bill No. 1950 (2019–2020 Reg. Sess.) (Assembly Bill 1950). The latter contention has merit, and we therefore reverse the probationary terms and remand for further proceedings. We otherwise affirm the judgment of conviction.

**FACTUAL AND PROCEDURAL BACKGROUND**

1. *Facts*

In September 2019, 55-year-old appellant Peterson, who is White, was homeless and living at Palms Park in Los Angeles.

Fourteen-year-old Osman H. and 10-year-old Noor J., who were both of Somali descent, attended an Islamic boarding school in Northridge. On the afternoon of September 13, 2019, three of their teachers, including Halil Kizkin, took Osman, Noor, and a group of 17 other students to Palms Park for recreational activities.

At the park, Osman played basketball and soccer, and then he and some other boys sat at a picnic table eating snacks. Peterson was at a barbeque about 36 feet away, and began to cook hot dogs. Osman and the other students did not say or do anything to Peterson. However, Peterson screamed "nigger" at the boys. He angrily yelled that he was going to choke them and hang them. Then he said he would kill Osman. Osman was scared. When another student went to get a drink of water, Peterson said he would "call his gang." Peterson was using a

2

straight-bladed knife to cook the hot dogs, but pulled a second, curved knife from his bag while yelling at the boys. He approached within 10 feet of them, holding the knife level with his head, in a manner such that it would thrust forward as he walked and said, "I'm gonna kill you." As he approached, the boys all walked backwards to get away from him. When asked why, Osman testified, "I didn't want him to kill me." He believed that Peterson was going to kill him and was scared.

Noor was also in the picnic area, sitting on a picnic table bench with a different group of boys. He had been playing soccer, and had stopped to have snacks. He observed Peterson from a distance of approximately 25 feet. Peterson was yelling and screaming. He pointed a knife at Noor and the other boys, and said "Nigga." Peterson yelled, "kick rocks," "I'm going to sue your kid and hang them," (*sic*.) and "I'm going to cut all of you if you come up to my face." Noor was scared; Peterson "was coming closer, and then my friends, we just [ran] away because we thought he was going to run and try killing us."[1] He was also afraid Peterson would stab Kizkin with the knife.

Osman, Noor, and two other boys—Abdi J., and Zackriye H.—ran to Kizkin. They told him a man had been screaming at them. All of them looked scared. All four boys pointed out Peterson, who was at the barbecue area 73 feet away.

---

[1] Noor told an officer who spoke to him at the park, "I saw [Peterson] and I just walked away." He also stated at trial that he left when Peterson used the racial epithet because this made him angry, and he did not like "staying in places that people get me mad."

Peterson approached to within six feet of where Kizkin was standing; the boys stood behind Kizkin. Peterson held the curved knife parallel to his head and slightly thrust it forward. He screamed angrily at Kizkin, who did not understand his mumbled words. Kizkin told Peterson to calm down. Peterson lowered the knife but continued to scream. He then went to the barbecue area where he removed his shirt, still screaming. He dropped the knife on the grass. Kizkin told the boys not to go to the side of the park where Peterson was, and they complied.

Meanwhile, a bystander called police. When a police helicopter flew overhead, Peterson yelled, "I'm not scared of the police. [Fuck] the police." Approximately ten minutes after the confrontation with Kizkin, Peterson left the park.

Officers arrived and spoke with Kizkin and the children. Their interactions with the children were captured on body-worn video cameras, and played by the defense at trial. Osman found the curved knife in the grass and brought it to an officer. Officers recovered it and a second knife with a straight blade that was on a picnic table. They were unable to find Peterson in the park.

Peterson was arrested a few days later. After waiving his *Miranda* rights,[2] he told the interviewing detective that he had been cooking hot dogs, and was using a knife to cut them up. Approximately 15 Black children who had been playing soccer came into the picnic area and bothered him by looking at him. They did not come close to him, but he thought they were going to rob him because he was wearing an expensive Omega watch that he had found in a dumpster. He perceived their actions as rude. He told an adult present at the park that the children were

---

[2]      *Miranda v. Arizona* (1966) 384 U.S. 436.

4

bothering him, and to keep them away from him. He admitted having the knife when he addressed the children and Kizkin, but claimed he held it at his side. He denied threatening the children or using the "n-word." He had consumed two 24-ounce containers of malt liquor before the incident, and admitted he "might have said some things." When the detective advised Peterson of the charges against him, Peterson stated that he wanted the children charged with harassment and attempted robbery.

The parties stipulated that Peterson had no neo-Nazi or swastika tattoos, and that the defense did not receive the body-worn video footage until after the preliminary hearing. The defense did not present other evidence.

2. *Procedure*

The jury convicted Peterson of making criminal threats against Osman (Pen. Code, § 422, subd. (a));[3] attempted criminal threat against Noor, a lesser included offense of making a criminal threat (§§ 664, 422, subd. (a)); and misdemeanor exhibiting a deadly weapon, a knife (§ 417, subd. (a)(1)).[4] It found the criminal threats offenses were hate crimes, that is, Peterson committed them in whole or in part because of bias based on actual or perceived race or ethnicity. (§ 422.75, subd. (a).) The trial court suspended imposition of sentence on the criminal threats counts and placed Peterson on formal probation for five years, with a variety of probation conditions, including that he

---

[3] All further undesignated statutory references are to the Penal Code.

[4] At the close of the People's case, the trial court granted the defense motion for judgment of acquittal pursuant to section 1118.1 on count 2, criminal threat against Zackriye H.

5

spend 384 days in jail with credit for 384 days served. The court likewise suspended imposition of sentence on the misdemeanor count and, as to that count, placed Peterson on formal probation for three years. Because Peterson did not have the ability to pay, the court suspended imposition of the applicable fees and fines.

Peterson filed a timely notice of appeal.

## DISCUSSION

1. *Peterson's challenges to the attempted criminal threats conviction*

Peterson contends that his conviction for making an attempted criminal threat against Noor cannot stand for two reasons: the evidence was insufficient to show he made a credible threat with an immediate prospect of execution; and the trial court failed to instruct that the threat had to have been sufficient to cause a reasonable person to be in sustained fear.

a. *Applicable legal principles*

Section 422 "prohibits 'willfully threaten[ing] to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement . . . is to be taken as a threat . . . which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety.'" (*People v. Chandler* (2014) 60 Cal.4th 508, 511 (*Chandler*).) Sustained fear is that which "'extends beyond what is momentary, fleeting, or transitory.'" (*People v. Wilson* (2015) 234 Cal.App.4th 193, 201; *People v. Fierro* (2010) 180 Cal.App.4th 1342, 1348–1349.)

6

A defendant may be guilty of making an *attempted* criminal threat if he or she, acting with the requisite intent, makes a sufficient threat that is received by the threatened person, but the person either does not understand the threat or it does not *actually* cause sustained fear. (*Chandler*, *supra*, 60 Cal.4th at p. 515.) To prove attempted criminal threat, the defendant must have undertaken a direct but ineffectual act toward completion of the crime. (*Id.* at p. 516.) He or she must have had the specific intent that the threat be taken as such, under circumstances sufficient to convey a gravity of purpose and an immediate prospect of execution, so as to cause the victim to be in sustained fear. (*Ibid.*) And—to avoid penalizing speech in potential violation of the First Amendment—the People must prove not only that the defendant had the *subjective* intent to threaten, but also that the threat was *objectively* threatening, i.e., "that the intended threat under the circumstances was sufficient to cause a reasonable person to be in sustained fear." (*Id.* at pp. 511, 518, 524–525.)

b. *Sufficiency of the evidence*

To determine whether the evidence was sufficient to sustain a criminal conviction, " ' "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.]' " (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1104; *People v. Vargas* (2020) 9 Cal.5th 793, 820.) We presume in support of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. (*People v. Baker* (2021) 10 Cal.5th 1044, 1103.) Reversal is unwarranted

unless it appears " ' " 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " ' " the verdict. (*People v. Penunuri* (2018) 5 Cal.5th 126, 142.)

Peterson contends the evidence was insufficient to support his conviction for making an attempted criminal threat to Noor because "Noor did not testify to hearing any credible threat or attempted threat with an immediate prospect of execution."

We disagree. Noor testified that Peterson, from a distance of approximately 25 feet, pointed a knife at him and the other boys; yelled and screamed; called the boys a racial epithet; and said "kick rocks," "I'm going to sue your kid and hang them," and "I'm going to cut all of you if you come up to my face." Peterson argues that the racial epithet, "while regrettable," was not a threat; "kick rocks" was "pure nonsense"; and the threat to cut the boys was conditional because they "never came up to appellant's face."

We agree that "kick rocks" was not an understandable threat. But the jury could reasonably conclude Peterson's other statements were. "A threat is an ' "expression of an intent to inflict evil, injury, or damage on another." ' [Citation.]" (*In re M.S.* (1995) 10 Cal.4th 698, 710.) A threat is sufficiently specific where it threatens great bodily injury. (*People v. Wilson* (2010) 186 Cal.App.4th 789, 806.) Peterson's threats to cut and hang the boys certainly threatened physical injury.

Contrary to Peterson's argument, the fact he used the word "if" in regard to his threat to cut the boys does not require a contrary conclusion. The "reference to an 'unconditional' threat in section 422 is not absolute." (*People v. Bolin* (1998) 18 Cal.4th 297, 339; *People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1433; *People v. Brooks* (1994) 26 Cal.App.4th 142, 149.) " 'Most threats

8

are conditional; they are designed to accomplish something; the threatener hopes that they *will* accomplish it, so that he won't have to carry out the threats.' " (*People v. Bolin*, at p. 339.) Section 422's use of the word "so," preceding "unequivocal, unconditional, immediate, and specific," indicates " ' "that unequivocality, unconditionality, immediacy and specificity are not absolutely mandated, but must be sufficiently present in the threat and surrounding circumstances to convey gravity of purpose and immediate prospect of execution to the victim.' [Citation.]" (*Id.* at pp. 339–340; § 422, subd. (a); *In re Ryan D.* (2002) 100 Cal.App.4th 854, 861; *People v. Brooks*, at p. 149.) Thus, "a threat subject to an apparent condition may violate section 422." (*People v. Dias* (1997) 52 Cal.App.4th 46, 48.)

Whether the communication was sufficiently unequivocal, immediate, and specific requires consideration of the totality of the circumstances, including the defendant's mannerisms, affect and actions involved in making the threat. (*People v. Solis* (2001) 90 Cal.App.4th 1002, 1013; *People v. Choi* (2021) 59 Cal.App.5th 753, 761–762; *People v. Martinez* (1997) 53 Cal.App.4th 1212, 1218, 1220 [meaning of a threat "must be gleaned from the words and all of the surrounding circumstances."].) " '[I]t is the circumstances under which the threat is made that give meaning to the actual words used. Even an ambiguous statement may be a basis for a violation of section 422.' " (*People v. Hamlin, supra,* 170 Cal.App.4th at p. 1433.)

Many courts have concluded that statements involving conditional language were nonetheless threats within the meaning of section 422. (See, e.g., *People v. Butler* (2000) 85 Cal.App.4th 745, 749, 754 [statement that victim needed to mind her own business or she was going to get hurt violated section

422]; *People v. Melhado* (1998) 60 Cal.App.4th 1529, 1536–1538 [reasonable juror could conclude that defendant's threat, "I'm going to blow you away if you don't bring my car back. I'm going home and I'm going to bring a grenade" met all section 422's elements]; *People v. Dias*, *supra*, 52 Cal.App.4th at pp. 48, 53 [a threat subject to an apparent condition may nonetheless be culpable under section 422]; *People v. Stanfield* (1995) 32 Cal.App.4th 1152, 1155, 1162 [threat to have lawyer killed if he did not join defendant's political party was a threat under section 422]; *People v. Brooks*, *supra*, 26 Cal.App.4th at pp. 144–145 [defendant put gun to victim's head and said, " 'If you go to court and testify, I'll kill you' " was a threat under section 422].)

Here, Peterson was a 55-year-old adult man. Noor was 10 years old. Peterson is White; Noor is Black. Peterson was holding a knife and pointing it at Noor and the boys as he yelled at them. He expressly threatened to cut and hang the boys, clear expressions of the intent to inflict physical harm upon them. His statement was not ambiguous. He was actually in possession of a knife, showing he had the ability to immediately make good on his threat. While his use of the racial epithet was not, by itself, a threat, in context it significantly added to the threatening import of his statements. In light of the foregoing authorities, we discern no evidentiary insufficiency.

### c. *Instructional error*

In a criminal case, even absent a request, the trial court must instruct the jury on the general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case. (*People v. Molano* (2019) 7 Cal.5th 620, 667.) We review claims of instructional error de novo. (*People v. Rivera* (2019) 7 Cal.5th 306, 326; *People v. Mitchell*

(2019) 7 Cal.5th 561, 579.) We consider the challenged instruction in the context of the trial record and the instructions as a whole to determine whether there is a reasonable likelihood the jury applied it in an impermissible or unconstitutional manner. (*People v. Rivera*, at p. 326.)

In *Chandler*, the defendant was charged with multiple counts of making criminal threats in violation of section 422. The trial court instructed with the standard versions of CALCRIM No. 1300 (regarding criminal threat) and CALCRIM No. 460 (regarding attempt). (*Chandler*, *supra*, 60 Cal.4th at p. 513.) The jury convicted Chandler of the lesser included offense of attempted criminal threat on two counts. (*Ibid.*) On appeal, he argued that the trial court should have instructed that the crime of attempted criminal threat requires a finding that the intended threat reasonably could have caused sustained fear under the circumstances. (*Ibid.*) Our Supreme Court agreed. It held that to "avoid substantial First Amendment concerns associated with criminalizing speech," the offense of attempted criminal threat requires proof the defendant "had a subjective intent to threaten *and* that the intended threat under the circumstances was sufficient to cause a reasonable person to be in sustained fear." (*Id.* at p. 525.) Accordingly, when a defendant is charged with attempted criminal threat, "the jury must be instructed that the offense requires not only that the defendant have an intent to threaten but also that the intended threat be sufficient under the circumstances to cause a reasonable person to be in sustained fear." (*Ibid.*)

*Chandler* did not determine whether the instructions given were insufficient, instead reasoning that, "whether or not the instructions adequately conveyed this element of the offense,

11

reversal is not warranted because any error was harmless beyond a reasonable doubt." (*Chandler*, *supra*, 60 Cal.4th at p. 525.) The court explained: "Upon reviewing the record, we conclude that no reasonable juror could have failed to find defendant's threats sufficient under the circumstances to cause a reasonable person to be in sustained fear. Neither the prosecution nor the defense ever suggested that defendant could be convicted of attempted criminal threat based solely on his subjective intent to threaten. Nor does the evidence suggest that the jury convicted defendant on that basis, since defendant expressly threatened to kill both victims. Moreover, the defense theory at trial did not contest the reasonableness of the victims' fear. Instead, defendant argued that there was reasonable doubt as to whether he made any of the alleged threats and that the threats, if made, did not cause actual or sustained fear." (*Ibid.*)

Here, as in *Chandler*, the court instructed with the standard versions of CALCRIM Nos. 1300[5] and 460.[6] The parties

[5]     In pertinent part, that instruction stated that to prove Peterson was guilty of making a criminal threat against Noor, "the People must prove that: [¶] 1. The defendant willfully threatened to unlawfully kill or unlawfully cause great bodily injury to Noor J.; [¶] 2. The defendant made the threat orally; [¶] 3. The defendant intended that his statement be understood as a threat; [¶] 4. The threat was so clear, immediate, unconditional and specific that it communicated to Noor J. a serious intention and the immediate prospect that the threat would be carried out; [¶] 5. The threat actually caused Noor J. to be in sustained fear for his own safety; [¶] AND [¶] 6. Noor J.'s fear was reasonable under the circumstances."

[6]     CALCRIM No. 460 stated: "To prove that the defendant is guilty of attempted criminal threat, the People must prove that:

agree that the court should have given an additional portion of CALCRIM No. 460, as suggested in the current Bench Notes, to comply with *Chandler*.[7]  The People argue the omission was harmless beyond a reasonable doubt.  (*Chandler*, *supra*, 60 Cal.4th at p. 525; see *People v. Merritt* (2017) 2 Cal.5th 819, 831.) Peterson argues the opposite.

Assuming the court's instructional omission was error, it was harmless.  As in *Chandler*, no party suggested that Peterson could be convicted based solely on his subjective intent to threaten the boys.  As in *Chandler*, Peterson expressly threatened physical harm to the victim.  And as in *Chandler*, the defense did not contend that the threats, if made, were insufficient to cause a reasonable person to be in sustained fear. Instead, counsel briefly argued that there was insufficient evidence the boys were actually scared.  The main thrust of the defense theory was that, because of a flawed police investigation, the prosecution failed to prove that Noor personally heard any threat.  The officer who interviewed the boys was still in training, did not interview the students separately, did not prevent them

---

[¶]  1.  The defendant took a direct but ineffective step toward committing criminal threat; [¶]  AND  [¶]  2.  The defendant intended to commit criminal threat."  After providing information on what constituted a direct step, the instruction concluded:  "To decide whether the defendant intended to commit criminal threat, please refer to the separate instructions (Instruction 1300) that I have given you on that crime."

[7]     As set forth in the Bench Notes to CALCRIM No. 460, that additional portion would have provided:  "3.  The intended criminal threat was sufficient under the circumstances to cause a reasonable person to be in sustained fear."

13

from talking among themselves, and asked leading questions. As shown in the body-worn video, when the officers arrived, all the boys gathered around and chimed in with their thoughts. Counsel argued that consequently, "we don't know who said what or if anybody said anything. We don't know. And the kids don't know if they really heard it or they heard somebody else say it." Counsel argued the jury should credit Peterson's statements that he did not make the threats or brandish the knife.

Peterson argues that this case is more analogous to *People v. Jackson* (2009) 178 Cal.App.4th 590. There, the owners of a house told the defendant, an acquaintance of a tenant who was vacating the premises, that he had to leave the property. After he packed up his things and went to the front yard, he threatened to " 'blow [the owners'] heads off' " with an AK-47 or " 'chop [their] heads off.' " (*Id.* at pp. 594–595.) The homeowners called police while defendant continued " 'ranting and raving.' " (*Id.* at p. 594.) The jury acquitted the defendant of making criminal threats, but found him guilty of the lesser offense of attempted criminal threats. (*Id.* at p. 595.) As in *Chandler* and the instant matter, the trial court had instructed with CALCRIM No. 1300, and on general principles of attempt. (*Id.* at pp. 598–599.) Presaging *Chandler*, the appellate court found an element of attempted criminal threat is that the threat could *reasonably* cause the victim to be in sustained fear, and the trial court's failure to so instruct was reversible error. (*Id.* at pp. 593, 598–599.) The court reasoned that the jury must have found the defendant made the " 'blow-your-head-off' " statements and intended them to be taken as threats, but concluded either that the victims did not suffer sustained fear or that their fear was unreasonable under the circumstances. As to the latter possibility, the jury

14

might have concluded that since the victims "were safely inside the house with a telephone to call the police while defendant sat out front, or since defendant's threats were so outlandish, that defendant's statements could not reasonably have caused the victims to suffer sustained fear," a scenario that was legally insufficient to support the conviction. (*Id.* at p. 600.)

Peterson argues that as in *Jackson*, his jury might not have believed a reasonable person would have suffered fear under the circumstances, because the statements Noor testified to were "mostly gibberish" and were not "immediate threats." But we find *Jackson* distinguishable for the same reasons that *Chandler* did. The Supreme Court there explained that, in contrast to the situation in *Jackson*—where the victims were safely inside the house with a phone to call the police, and defendant's threats were outlandish—in *Chandler* the two victims "testified that defendant, a neighbor, made explicit threats that he was going to kill each of them, and defendant made the threats while face-to-face with the victims (and, in [one victim's] case, while swinging a golf club) on the street where the victims lived." (*Chandler*, *supra*, 60 Cal.4th at p. 526.) Similarly, here, Noor was not in a place of safety when Peterson made the threats; he was in a public park and face-to-face with Peterson. Moreover, unlike in *Jackson*, where the defendant did not actually have a weapon at the time he made the threats, here Peterson was actually pointing a knife at Noor. And, given that fact, Peterson's threat to cut the boys cannot be considered outlandish. As *Chandler* reasoned: "defendant's threats were sufficient under the circumstances to cause a reasonable person to be in sustained fear—indeed, defendant did not argue otherwise at trial—and no

15

reasonable juror could have concluded otherwise." (*Id.* at p. 526.) Any instructional error was harmless beyond a reasonable doubt.

## 2. *Assembly Bill 1950*

As  noted *ante*, the trial court placed Peterson on probation for a five-year term on the criminal threats offenses, and a three-year term on the misdemeanor offense of exhibiting a deadly weapon.  When Peterson was sentenced, these terms were permissible.  Former section 1203.1, subdivision (a), provided that a court could suspend sentence on a felony conviction and impose a probationary period not exceeding the maximum possible term for the offense, or five years.  Former section 1203a similarly provided that a probationary term on a misdemeanor could not exceed three years.

Effective January 1, 2021, while Peterson's appeal was still pending in this court, the Legislature passed Assembly Bill 1950. That legislation provides that a felony probation term cannot exceed two years, subject to exceptions not applicable here.  (See *People v. Quinn* (2021) 59 Cal.App.5th 874, 879; *People v. Sims* (2021) 59 Cal.App.5th 943, 955–956.)  Assembly Bill 1950 also amended section 2103a to limit the maximum length of a probation term for most misdemeanor offenses to one year. (*People v. Sims*, at p. 956, fn. 7; *People v. Quinn*, at p. 882, fn. 4.)

Peterson contends that under *In re Estrada* (1965) 63 Cal.2d 740, Assembly Bill 1950 applies retroactively to his sentence and requires reduction of his probation terms.  The People do not challenge this claim, and assert that the matter must be remanded for resentencing in compliance with Assembly Bill 1950.  We agree with the parties.

The courts that have considered the issue have uniformly found Assembly Bill 1950's "limitation on the maximum duration

16

of felony probation terms constitutes an ameliorative change to the criminal law that applies retroactively to cases that were not reduced to final judgment as of the new law's effective date." (*People v. Sims*, *supra*, 59 Cal.App.5th at p. 947; *People v. Czirban* (2021) 67 Cal.App.5th 1073, 1095; *People v. Quinn*, *supra*, 59 Cal.App.5th at p. 883 [the ameliorative nature of Assembly Bill 1950's amendment " 'places it squarely within the spirit of the *Estrada* rule' " and the Legislature clearly intended that the amendment apply retroactively]; *People v. Stewart* (2021) 62 Cal.App.5th 1065, 1073–1074, review granted on another ground, June 30, 2021, S268787; *People v. Lord* (2021) 64 Cal.App.5th 241, 246 [Assembly Bill 1950 "applies retroactively under *Estrada* because it ameliorates a criminal penalty and the Legislature has not indicated a contrary intent."]; *People v. Schulz* (2021) 66 Cal.App.5th 887, 891–892, 894–895 [agreeing that Assembly Bill 1950 applies retroactively, but finding it inapplicable in that case]; *People v. Burton* (2020) 58 Cal.App.5th Supp. 1, 14–19.)  We agree with the reasoning of these authorities and conclude Peterson is entitled to the benefit of Assembly Bill 1950.

The People argue that the appropriate remedy is to remand to allow the court to reassess Peterson's probation status within the context of Assembly Bill 1950.  They suggest that merely striking the portion of the probationary terms that exceed the new statutory limits deprives the court and the parties "of a necessary determination of the status of the probation at the time it was terminated," and might impair Peterson's ability to obtain expungement of his conviction, if he were to seek that remedy in the future.  It would also deprive the court of the ability to adjust, modify, or strike probation terms as necessary to take into

account the shortened probationary periods.  In his reply brief, Peterson does not appear to oppose this remedy as an alternative to modification of the probationary terms by this court. Accordingly, in line with several other courts, we direct that the orders of probation be reversed and the matter remanded for resentencing in accordance with sections 1203.1 and 1203a, as amended by Assembly Bill 1950.  (See *People v. Czirban*, *supra*, 67 Cal.App.5th at pp. 1095, 1097; *People v. Sims*, *supra*, 59 Cal.App.5th at p. 964; *People v. Lord*, *supra*, 64 Cal.App.5th at p. 246.)

## DISPOSITION

The orders of probation are reversed, and the matter is remanded to the trial court for resentencing with directions to modify Peterson's terms of probation in accordance with section 1203.1, subdivision (a) and 1203a, subdivision (a), as amended by Assembly Bill 1950. In all other respects, the judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

LAVIN, J.

MATTHEWS, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

19