Filed 5/4/23  P. v. Taylor CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B317861 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA479706) |
| v. | |
| LEROY TAYLOR, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Norman J. Shapiro, Judge.  Affirmed as modified.

Richard B. Lennon and Jennifer Peabody, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Kenneth C. Byrne, Supervising Deputy Attorney General, and Blake Armstrong, Deputy Attorney General, for Plaintiff and Respondent.

A jury found defendant and appellant Leroy Taylor (defendant) guilty of assaulting his neighbor Shawn Joseph (Joseph), criminally threatening Joseph, and disobeying a civil restraining order Joseph previously obtained against him. The trial court sentenced defendant to six years in prison and issued a restraining order, ostensibly pursuant to Penal Code section 136.2,[1] that prohibits certain contact with Joseph for ten years. We are asked to decide whether defendant's conviction for criminal threats was supported by substantial evidence, whether the trial court had a sua sponte duty to instruct the jury on the lesser included offense of attempted criminal threats, and whether the protective order was authorized by section 136.2.

## I. BACKGROUND

### A. *Joseph Obtains a Civil Restraining Order Against Defendant*

In 2013, Joseph, his wife, and three children moved to a home on South Mansfield Avenue in the City of Los Angeles. At the time, defendant lived on the same block, just two houses away from Joseph and his family.

Four years after becoming neighbors, a dispute arose between defendant and Joseph over the upkeep of an apartment building located on the same block. The building belonged to one of Joseph's sisters. After his sister moved away, the grass on the building's lawn grew, in Joseph's words, "out of control. It was just wild." Defendant complained to Joseph about the overgrown lawn, believing it was Joseph's responsibility to maintain the

---

[1] Undesignated statutory references that follow are to the Penal Code.

2

property's appearance. When Joseph did not cut the lawn, defendant began to harass Joseph and his family, which led Joseph to obtain a civil restraining order protecting him and his family from defendant.

That restraining order, issued in October 2018, allowed defendant to access his home if he acted in a "peaceable" manner but otherwise required him to stay 100 yards away from Joseph, his wife, and children; not contact them in any way; and not "[h]arass, intimidate, molest, attack, strike, stalk, threaten, assault (sexually or otherwise), hit, abuse, destroy personal property of, or disturb the[ir] peace . . . ." This order, which would be operative for three years, was personally served on defendant.

In the months following issuance of the restraining order, defendant continued to harass Joseph and his family on a weekly, if not daily, basis. Some of defendant's conduct was, as Joseph would later characterize it, "silly stuff" that was more of a "nuisance" than anything else: defendant would often spit near Joseph or members of his family and, on one occasion, defendant shouted at Joseph and his wife, pulled down his pants, exposed his buttocks, and brandished his middle finger at them.

As time passed, defendant's harassing behavior escalated. In April 2019, defendant repeatedly threatened physical violence, stating he was going to either beat Joseph up or kill him and his family. The following month, while defendant was inside his house but within earshot of Joseph's wife and minor daughter, defendant yelled, "[t]ell your husband I'm gonna shoot him in his mother fucking back."

After these statements, Joseph was unsure of what "[defendant] was capable of doing." Joseph's wife would not go

outside alone, and she and Joseph refused to allow their children to walk to a nearby convenience store unaccompanied. Both of Joseph's daughters expressed fear of defendant, with one receiving counseling because she was "constantly afraid."

To safeguard his family, Joseph began working from home. In addition, he planted barrier hedges to block defendant's view of his family's house and installed multiple security cameras. Joseph also reported defendant's conduct to the police.

### B.    The Incident That Led to Defendant's Arrest

On the evening of July 19, 2019, Joseph and his wife were out walking their dog. Joseph crossed the entrance to a dead-end alley, and from out of the ally's depths, defendant appeared and yelled at Joseph, "Come in the alley, mother fucker. Come in the alley." Joseph thought defendant appeared "angry, very angry."

Defendant advanced on Joseph while holding a two-foot long white stick, approximately the width of a half-dollar coin. Joseph recognized the stick as one defendant had used on a prior occasion to smash a metal mailbox as he threatened Joseph.[2] Recalling the incident with the mailbox and believing defendant was "really, really strong," Joseph retreated. As defendant followed Joseph, he raised the stick from a 45-degree angle pointed at the ground to head level, said, "I'm going to beat you to death," and swung the stick toward Joseph. If Joseph had not moved back, the stick would have hit him in the face; the stick

---

[2]    On that prior occasion, as he struck the mailbox, defendant said to Joseph, "Motherfucker, come over here. Come over here, motherfucker. I'm going to whoop your ass."

passed so close to his face that Joseph could feel the wind from the passage of the stick through the air.

After defendant repeated his threat to beat Joseph to death, he turned in the direction of Joseph's wife who was standing some distance away and said, "you're next." In response, Joseph ran to interpose himself between defendant and his wife. Although he was "scared" for himself, he was more concerned for his wife who was unaware defendant had confronted him.

After Joseph moved toward his wife, defendant ran across the street and entered a different alley, laughing as he went. Having lost sight of defendant, Joseph left his wife and ran toward the entrance of the alley into which defendant disappeared so as not to be caught off guard if defendant decided to make good on his threats against him and his wife. After less than a minute, Joseph and his wife returned home where they called 911. Joseph waited outside for the police to arrive because, in light of defendant's actions, he was "afraid" and "didn't know what was next."

Shortly after Joseph and his wife left to return inside their home, defendant reemerged from the second alley with his stick and disappeared. He later returned to his home where, beginning at 7:51 p.m., he and Joseph engaged in a verbal "back and forth" from their respective properties for several minutes. During the parties' verbal confrontation, which one of Joseph's surveillance cameras recorded, defendant repeatedly cursed at Joseph. Joseph told defendant he was not scared in the alley, challenged defendant to "keep stalking" him and his family, and repeatedly questioned defendant's bravery.

After this verbal jousting, and after police failed to respond to Joseph's first 911 call, Joseph called 911 a second time at 8:24 p.m. He told the operator that a neighbor, against whom he had an "active restraining order," "charged [him] with a stick and said that he was going to beat [him] to death." Following the second 911 call, the police arrived at Joseph's home but were unable to locate defendant. Two hours later, at 10:24 p.m., Joseph placed a third call to 911. He told the operator his "neighbor had threatened to assault [him] . . . with a stick he had in his hand [¶] . . . [¶] and he swung it at me. And the police came out . . . but they couldn't get him to come outside. But he's outside right now . . . ."

Defendant was arrested later that night. The Los Angeles County District Attorney charged him with two felonies, assault with a deadly weapon (§ 245, subd. (a)(1)) (count one) and criminal threats (§ 422, subd. (a)) (count two), and one misdemeanor, disobeying a court order (§ 166, subd. (a)(4)) (count three). The information against defendant alleged, in connection with the felony counts, that defendant suffered a prior serious or violent felony conviction in 2015.[3]

---

[3]     In a sentencing memorandum filed after defendant's trial and conviction in this case, the prosecution advised the trial court that the victim of defendant's 2015 crime was another of defendant's neighbors. The prosecution maintained defendant "terrorized" that neighbor before ultimately "displaying a knife in a threatening manner while saying, 'I'm going to finish you off.'"

*C.    Defendant's Trial, Conviction, and Sentencing*

At trial, only two witnesses testified for the prosecution: the investigating detective, who described his collection of relevant footage from various surveillance cameras, and Joseph. Joseph testified he had been concerned for his safety from the time defendant first called to him from the alley to when the police arrived at his home in response to his second 911 call, a period of approximately 45 minutes. Defendant elected not to testify or present any witnesses.

The jury found defendant guilty on all counts. The trial court sentenced defendant to an aggregate term of six years in prison: three years for assault with a deadly weapon, doubled as a result of his prior felony conviction (§ 1170.12, subds (a)-(d)); two years for criminal threats, stayed pursuant to section 654; and six months for disobeying the restraining order, also stayed pursuant to section 654. In addition, the trial court (without a request from the prosecution) stated it was issuing a 10-year protective order pursuant to section 136.2 that would prohibit defendant from annoying, harassing, threatening, or striking Joseph, or otherwise disturbing his peace.

## II.  DISCUSSION

We reject as meritless defendant's principal argument for reversal: that there was insufficient evidence Joseph was in sustained fear to support the criminal threats conviction (for which sentence was stayed). Joseph testified he was in fear or "scared," and that testimony was well corroborated by defendant's escalating threats and harassment, the precautions taken by Joseph to safeguard his family, the contemporaneous assault with the stick, and Joseph's repeated calls for police

7

assistance. We additionally hold the absence of an instruction on the lesser included offense of attempted criminal threats does not warrant reversal of the criminal threats conviction. Even viewing the evidence in the light most favorable to defendant, there is no substantial evidence Joseph did not suffer sustained fear, and regardless, there is certainly no reasonable probability the jury would have convicted on the lesser, and not the greater, offense.

Defendant's challenge to the 10-year protective order the trial court issued, however, has merit—as the Attorney General concedes. The protective order was unauthorized because, on the facts here, section 136.2 limits the duration of a protective order to the pendency of the criminal proceeding. Accordingly, we will modify the judgment to strike the protective order and otherwise affirm.

### A. There Is Substantial Evidence of the Sustained Fear Required for Conviction of Making Criminal Threats

"In order to prove a violation of section 422, the prosecution must establish all of the following: (1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat—which may be 'made verbally, in writing, or by means of an electronic communication device'—was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of

8

execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances.  [Citation.]"  (*People v. Toledo* (2001) 26 Cal.4th 221, 227-228 (*Toledo*); accord, *People v. Orloff* (2016) 2 Cal.App.5th 947, 953.)  Defendant challenges the sufficiency of the evidence regarding the fourth element: whether Joseph suffered from sustained fear.

Sustained fear for purposes of section 422 means a period of time that extends beyond what is "momentary, fleeting, or transitory."  (*People v. Allen* (1995) 33 Cal.App.4th 1149, 1156 (*Allen*).)  A victim's fear need not last for an extended period, such as days or weeks.  Several courts, for example, have found "[f]ifteen minutes of fear . . . is more than sufficient to constitute 'sustained' fear for purposes of . . . section 422."  (*Id*. at 1153, 1156 [15 minutes between threat and defendant's arrest sufficient for finding of sustained fear]; accord, *People v. Fierro* (2010) 180 Cal.App.4th 1342, 1346, 1348-1349 [affirming a finding of sustained fear where the defendant threatened to kill the victim during an incident at a gas station and the victim was still in fear 15 minutes after he had left the station].)  In considering whether the element of sustained fear was met, a trier of fact may rely on evidence indicating the victim had knowledge of the defendant's prior threatening conduct and had previously reported this conduct to the police.  (*Allen*, *supra*, 33 Cal.App.4th at 1156.)

We review the sufficiency of the evidence supporting the trier of fact's conclusion using the substantial evidence standard of review.  (*People v. Westerfield* (2019) 6 Cal.5th 632, 713.)

9

There is strong evidence Joseph was in sustained fear following his encounter with defendant in the alley. Joseph testified clearly and without qualification he was afraid for himself and his wife during the encounter at the alley and remained in a state of fear until after the police finally arrived in response to his second call to 911, a period of time which was considerably longer than 15 minutes. Contrary to defendant's assertion, Joseph's testimony was not "inherently incredible"— certainly not in view of defendant's escalating threats following the issuance of the restraining order, the precautions and expense Joseph undertook in response to defendant's earlier harassment and threats, the assault with the deadly weapon that occurred essentially simultaneously with the death threat giving rise to the criminal threats conviction, and Joseph's multiple calls to 911 on the night in question (two of which came *after* Joseph, in the presence of his wife, claimed defendant had not scared him—a comment that, as Joseph put it, was made to "show some courage" while defendant continued his threatening and berating).

### B. The Absence of an Instruction on Attempted Criminal Threats Does Not Warrant Reversal

"[E]very lesser included offense, or theory thereof, which is supported by the evidence must be presented to the jury." (*People v. Breverman* (1998) 19 Cal.4th 142, 155 (*Breverman*), italics omitted.) This is true even absent a request for such an instruction. (*People v. Birks* (1998) 19 Cal.4th 108, 112.) However, "the existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense." (*Breverman*, *supra*, 19 Cal.4th at 162.) Rather, "such

instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. [Citations.] 'Substantial evidence' in this context is "'evidence from which a jury composed of reasonable [persons] could . . . conclude [ ]'" that the lesser offense, but not the greater, was committed." (*Ibid*.)

An instruction on the crime of attempted criminal threats (see *Toledo*, *supra*, 26 Cal.4th at 231 [confirming the existence and constitutional validity of the crime]; accord, *People v. Chandler* (2014) 60 Cal.4th 508, 514) is required when there is substantial evidence "a defendant, . . . acting with the requisite intent, makes a sufficient threat that is received and understood by the threatened person, but, for whatever reason, the threat does not *actually* cause the threatened person to be in sustained fear for his or her safety even though, under the circumstances, that person reasonably could have been placed in such fear . . . ." (*Toledo*, *supra*, at 231.) We review a claim that the trial court should have instructed on a lesser included offense de novo (*People v. Nelson* (2016) 1 Cal.5th 513, 538), considering the evidence in the light most favorable to the *defendant* (*People v. Aguilar* (2019) 41 Cal.App.5th 1023, 1027; *People v. Brothers* (2015) 236 Cal.App.4th 24, 30).

Contrary to defendant's claims, evidence of Joseph's goads and taunts made from the sanctuary of his doorstep was not sufficiently substantial to convince a reasonable jury that defendant committed the lesser offense of attempted criminal threats, but not the greater offense of criminal threats. In contrast to the victim's trial testimony in *Toledo* that she was not in fear of her husband's threats (*Toledo*, *supra*, 26 Cal.4th at 225), Joseph testified in plain and categorical terms that

defendant's words and conduct at the alley frightened him and that he remained in a state of fear until the police arrived approximately 45 minutes after the encounter at the alley. In addition, there was abundant evidence showing Joseph was indeed fearful: when defendant threatened him at the first alley, he never advanced on defendant and only retreated; he moved with speed to protect his wife when defendant threatened her; when defendant disappeared from view into another alley, Joseph raced to, but not *into* the second alley, in an attempt to keep defendant under observation; and after his encounter with defendant at the alleyway, Joseph returned home without appreciable delay and repeatedly called the police. This evidence, even viewed in the light most favorable to defendant, defeats any suggestion that a lesser included offense instruction was required.

Moreover, even if an instruction on the lesser included offence was required, it was harmless not to give it on these facts because it is not reasonably probable defendant would have obtained a more favorable result if the jury was instructed on attempted criminal threats. (*Breverman, supra*, 19 Cal.4th at 165, 177 [when assessing prejudice we "focus[ ] not on what a reasonable jury *could* do, but what such a jury is *likely* to have done" and we "consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result"].) The jury found defendant assaulted Joseph with a deadly weapon, and the key criminal threat was intimately bound up in that assault; there is no likelihood under the circumstances that

12

the jury would have believed defendant was not in sustained fear and reached a more favorable verdict.

### C. *The Protective Order Is Unauthorized*

Section 136.2 permits the trial court in a criminal case to protect a witness or a victim by issuing a protective order. In pertinent part, subdivision (a)(1) of the statute provides, "[u]pon a good cause belief that harm to, or intimidation or dissuasion of, a victim or witness has occurred or is reasonably likely to occur, a court with jurisdiction over a criminal matter may issue orders including, but not limited to, the following: [¶] . . . [¶] (D) An order that any person described in this section shall have no communication whatsoever with any specified witness or any victim . . . ." (§ 136.2, subd. (a)(1)(D).)

Protective orders issued pursuant to section 136.2 to protect witnesses and victims, are of a "limited duration"; they may be issued "only during '"the pendency of [a] criminal action."'"[4] (*People v. Ponce* (2009) 173 Cal.App.4th 378, 382 [striking three-year postjudgment protective order] (*Ponce*); accord, *People v. Corrales* (2020) 46 Cal.App.5th 283, 285-287 [striking unlimited "stay away" order imposed at sentencing because section 136.2 "does not authorize a trial court to impose a postjudgment restraining order against a criminal defendant"]; *People v. Selga* (2008) 162 Cal.App.4th 113, 118-119 [striking

---

[4] Section 136.2, subdivision (i)(1) provides for postjudgment protective orders extending for as long as 10 years but only under circumstances not applicable here, e.g., for defendants convicted of a crime involving domestic violence as defined by section 13700 or Family Code section 6211.

13

protective order issued during trial and later made a posttrial probation condition, because "protective orders issued under section 136.2 were operative only during the pendency of the criminal proceedings"].)

Although defense counsel did not object to the trial court's issuance of a postjudgment protective order, defendant has not waived his claim on appeal that the order was unauthorized. (*People v. Dotson* (1997) 16 Cal.4th 547, 554, fn. 6 ["A claim that a sentence is unauthorized, . . . , may be raised for the first time on appeal, and is subject to judicial correction whenever the error comes to the attention of the reviewing court"]; accord, *People v. Codinha* (2021) 71 Cal.App.5th 1047, 1083.)

Because the protective order here was not authorized by section 136.2, and not available to the trial court under its inherent judicial authority (*Ponce, supra,* 173 Cal.App.4th at 383), we will strike it.

DISPOSITION

The 10-year criminal protective order issued on January 25, 2022, is stricken.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


BAKER, Acting P. J.

We concur:


MOOR, J.


KIM, J.

15