Filed 9/18/24  P. v. Hayter CA1/5
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>SAMUEL WAKILI HAYTER,<br><br>    Defendant and Appellant. | A166840<br><br>(San Mateo County<br>Super. Ct. No. 22-NF-009115-A) |

Samuel Wakili Hayter (appellant) appeals from his convictions for criminal threats against Jane Doe (Pen. Code,[1] § 422, subd. (a)), attempted criminal threats against Robert B. (§§ 422, subd. (a), 664), dissuading a witness by force or threat against Robert B. (§ 136.1, subd. (c)(1), and carrying a concealed dirk or dagger (§ 21310).  We affirm.

BACKGROUND

*Prosecution Case*

Doe testified that she met appellant about eight years earlier, when he was incarcerated and she worked at the jail.  After he was released, they began dating.  During the first year of their relationship, appellant accused her of infidelity and, on three occasions, was physically violent: he slapped

---

[1] All undesignated statutory references are to the Penal Code.

her face; burned the back of her wrist with a lighter, leaving a "tiny scar" that had "pretty much faded"; and hit her on the thigh with an antenna-like object. After the first year, the relationship improved and appellant stopped engaging in physical violence, but he continued to accuse Doe of infidelity from time to time and she modified her behavior so as not to upset him.

On a Friday in July 2022, Doe and appellant checked into a hotel room to spend the weekend together, which they did regularly. About 5:00 p.m., Doe left to have dinner with a female friend. She told appellant she would be back in a couple of hours, but did not return until about 11:00 p.m. Appellant was not in the hotel room when she returned, but arrived about 15 to 20 minutes later. He seemed upset and started accusing her of being with another man. Doe testified his tone was "[v]ery harsh[,] [v]ery scary, dark," and was "like the first time it got physical, like in that first year we were together." She began to pack her belongings and appellant continued to accuse her. At one point, appellant "cornered" her, "took his finger and kind of pressed it on my chest up against the wall," and "said when we get home, we're going to go to one of the guys that he associated me with and then after that, I'm going to hurt you." At some point in the hotel room, Doe saw that appellant had a flat, metal object with a sharp end, which she had seen him with in the past.

Appellant left the hotel room first and headed in the direction of Doe's car. Doe left soon after and headed in a different direction, for the hotel lobby. Robert B. was working in the lobby and Doe showed him her phone, where she had typed the note: " 'Can you call the police.' "[2] She was crying and felt helpless and afraid. She wanted the police to come to help diffuse

---

[2] Robert B. did not testify at trial.

the situation with appellant. Doe asked Robert B. if she could use the restroom and he let her in the lobby, locking the door behind her.

After a few minutes, appellant approached the lobby. Appellant tried to get Doe's attention and asked Doe for her phone to make a call because he did not have a phone. When Doe did not look up at him, appellant pointed at Robert B. and shouted, " 'If you call the police, I'm going to kill you.' " Appellant then looked at Doe and said, " 'And then after that, I'm going to come back and kill you,' " a threat Doe said was directed at "me and my family." Doe testified she was "[o]ne hundred percent" afraid of the threat, and was still afraid at the time of her testimony. Appellant also threatened to slash Doe's tires, which made her want to leave the lobby to protect her car. Doe testified in that moment she was more concerned about her car than her safety, but that was because she "wasn't thinking right." The police arrived after Doe had been in the lobby for about 10 minutes.

The responding officer testified he saw appellant standing a few feet from a car and, as the officer approached, appellant appeared to throw something into the car. The officer retrieved a modified screwdriver with a sharpened tip from the front passenger seat of the car, and also found a wood file tucked in the back of appellant's waistband. The officer testified Doe was "distraught" and crying. Doe subsequently obtained a restraining order protecting her from appellant, who has not violated the restraining order.

*Defense Case*

Appellant testified he met Doe while he was in jail, and they began dating a few months after his release. He admitted that Doe's testimony about the physical violence during the first year of their relationship was "[p]retty much accurate." On cross-examination, he elaborated that when he slapped her, he "[w]as lashing out" because he felt "disrespect[ed]," and felt

3

"[v]ery bad" about it after. He burned her hand because he believed she was lying to him and he told her, "You keep lying, I'm going to burn you. A lie will get you burned." When he believed she continued to lie, he burned her because, "I promised to do what I said I was going to do. And I did." With respect to the incident with the antenna, he testified Doe was screaming inside his mother's house and refused to lower her voice, so, "I said, you keep screaming, I'm going to hit you with this antenna. And she continued to scream, so I hit her with the antenna like I said I would."

On the evening at issue, after Doe left to meet her friend, appellant spent his time smoking outside the hotel and making small talk with other guests. When he found she had returned to the hotel room, he asked about her dinner and got into bed with her. Doe put her head on his chest and appellant started rubbing her head. Then, all of sudden, Doe jumped up and said, "I don't know what you're trying to do," and began packing her bags. Appellant was surprised and upset because "[i]t was like she was getting dressed to leave me stranded out there in the middle of nowhere."

Appellant admitted getting "smart-mouthed" and "being like a little jerk," but denied touching her. He quickly got dressed and left the hotel room with Doe right behind him, and they both went to the lobby to turn in their keys. Appellant then walked over to Doe's car and waited for her, but she never came. He went back to the lobby to see what she was doing and saw her sitting in the office. He asked Doe to open the door, but she ignored him. He asked her to "at least" unlock the car but she said no. After he told her he would "pop your tires" if she did not unlock the car, she did unlock it.

Appellant sat in the car until he heard sirens. Unsure if Doe had called the police, he returned to the lobby and asked her and Robert B. When he found out they had called the police, appellant became "very upset, very

4

angry. Because my past history, I've had many run-ins with the police, I mean, . . .extensive contact with the police. And it's never been, like, the best." Appellant told Robert B., "[I]f the police come here and arrest me, I'm going to have to come back and do something to you." He then told Doe that if, instead of having dinner with her friend, she had gone "to my mother's house and something happened to my mother, then I'm going to have to come back and do something to you too."[3] On cross-examination, he conceded that he "might have said the word 'kill.' "

Appellant admitted throwing "the little screwdriver thing" into the car when the police arrived and said he wanted to throw down the file as well, to "disarm myself completely, so there wouldn't be no mistakes, no shooting, and say, well, we found this on him later." On cross-examination, he admitted he sharpened the modified screwdriver and that it can be used as a weapon.

*Verdict and Sentencing*

The jury found appellant guilty as charged. In a bifurcated proceeding, the trial court found true allegations of two prior felony offenses. The court sentenced appellant to an aggregate prison sentence of four years four months.

---

[3] Appellant explained, "When I was at the hotel all of those hours waiting for [Doe] to come back from her dinner date, she could have been at my mother's house doing whatever, breaking in the door with some guy that I thought she might be cheating with and looting the place and doing whatever they wanted to do. I mean, that's the neighborhood I live in, light weight. I know people like that that do that type of stuff. So it wasn't a far stretch for me, you know. All of a sudden she comes back, she's acting funny. . . . So my suspicions were raised."

DISCUSSION

I.    *Prior Offense*

Appellant argues the trial court erred in overruling a defense objection to appellant's testimony about a prior offense and by failing to issue a sua sponte limiting instruction for this testimony. In the alternative, appellant argues he received ineffective assistance of counsel. We reject the claim.

A.    *Additional Background*

Before trial, the prosecutor moved in limine to impeach appellant, if he testified, with multiple prior convictions of moral turpitude going back approximately 10 years. The prosecutor did not seek to impeach appellant with a 1995 involuntary manslaughter conviction. Appellant argued the prejudicial effect of the convictions outweighed their probative value. The trial court ruled the prosecutor could impeach with a 2017 concealed firearm conviction but the remaining convictions were more prejudicial than probative. The court further limited the impeachment evidence to the offense and date of conviction, specifically excluding "any of the underlying facts of that felony conviction."

At trial, during the prosecutor's recross-examination of appellant, the prosecutor asked about the modified screwdriver, which appellant had testified he carried for "protection." The following exchange ensued:

"Q.    You just told us you carry it because you are often outnumbered and you are concerned about your safety?

"A.    Sometimes.

"Q.    So what was it about the fact that you had gone to South San Francisco to a hotel with your then girlfriend that made you feel so unsafe that you had to carry a sharpened screwdriver up your sleeve?

"A.    My first case involved me shooting two people because it escalated from a fight and I was out with my girlfriend and her mother and her sister.  And so I was out with my girlfriend and I didn't have no weapons, but they rolled up on us and they had guns.  So it's happened before.  So that's why I carry it for me and her safety.

"Q.    You shot two people?

"A.    Yes, sir.

"Q.    But you didn't have a gun?

"A.    I don't have a gun.

"Q.    No.  At that time.  When you shot the two people, you said you did not—you weren't carrying a gun; they came up on you with guns?

"A.    They did come up on me with guns.

"Q.    How was it that you—

"A.    No.  I'm saying that's what led up to me shooting the two people.  They rolled up on me and my girlfriend with her mother and her sister when I was younger, 17.

"Q.    They had guns, but you did not have a gun?

"A.    Exactly.  Exactly.  I was in a restaurant.

"Q.    You somehow got a gun?

"A.    No.  I didn't shoot them that night.  I'm saying it led up to that.  I said all of that to say I have been out with my girlfriend and been in dangerous situations.  That's what I'm saying.  That's why I carry this.

"Q.    Who did you shoot?

"A.    The two people that came for me with a gun.

"Q.    But not that same night?

"A.    No.

"Q.    So they came—

7

"A.    Many times.

"Q.    You said they rolled up on you?

"A.    Yes.  They came many times looking for me."

At this point, defense counsel objected "on relevancy." Following an unreported sidebar, the trial court overruled the objection and the prosecutor's examination continued:

"Q.    So two people, as you said, rolled up on you and your girlfriend and her mother. Was that correct?

"A.    Not [Doe]. This is my high school sweetheart.

"Q.    Right. Previous.

"A.    Yes. I have already served the time for that.

"Q.    But then my question is you said you didn't have a gun that night but then you shot the two people. So my question then is how much time passed between the time when you say they rolled up on you and the point in time when you got yourself a gun and went and shot them?

"A.    Maybe eight months or so. It was when I was in high school. We used to fight a lot, and they came looking for me at a party. That's the night I shot them. They came to my neighborhood looking for me. So that's the night that we both shot at each other.

"Q.    So they came looking for you and you already had a gun on you?

"A.    Yes.

"Q.    You had started carrying a weapon at that point in time?

"A.    Yes.

"Q.    And you shot both of them?

"A.    Yes."

During closing arguments, the prosecutor discussed this testimony, saying appellant was, "Capable and ready to do violence at any point in time.

Walking around—walking around with this up his sleeve, sharpened into a weapon, up his sleeve. And I have to admit, it was chilling yesterday to hear that that man who told you he shot two people, he's willing to burn his girlfriend because he doesn't like what she is saying or doing, or hit her with an antenna, he is walking around with this and he said everywhere he goes, anywhere he goes, with a hair-trigger temper, there is nothing that's going to stop him."

Later during his closing argument, the prosecutor again referenced this testimony in discussing the jury instructions on evaluating witness credibility: "As it relates to the testimony that [appellant] gave yesterday, I'm not quite sure how to describe it because it was chilling, amazing, frightening. This man right here, he told you he was involved at a young age—he said some people rolled up on him and so—with guns. No testimony that they shot at him or did anything, but they just came at him in some fashion, him and his girlfriend and her mother. And his response was, not that day—remember, because there was a back-and-forth. I was a little confused. Because he said he shot those two people. So I thought, well, if he didn't have a gun, how did he shoot them? I was questioning to see maybe there was some kind of struggle, he got the gun. [¶] Turns out when he shot those people, it was eight months later, retaliation when he shot them. That's criminal conduct. You can consider that, the type of person and his mindset. Because he said he had been in and out of jail. He said he did time actually for that offense. So you know he was convicted of shooting—for shooting those two people. [¶] He told me he's a convicted felon. He said ex-felon. Again, same thing. But consider. Do you think that [appellant] can in any way, shape or form exercise any type of restraint?"

B.    *Analysis*

Appellant first argues the trial court erred in overruling his trial counsel's objection to the prosecutor's continued questioning about the facts of the shooting.  We assume, without deciding, that counsel's relevance objection was sufficient to preserve appellant's claim on appeal that the objection should have been sustained pursuant to Evidence Code section 352.[4]  We further assume, without deciding, that the trial court's ruling was in error.

We turn to whether any such error was prejudicial.  As an initial matter, there was ample evidence of appellant's criminal background already in the record.  Appellant and Doe both testified they met while appellant was in jail.  Appellant also testified he had broken the law "many times" and did "a lot of illegal things," including selling drugs and driving under the influence.  In addition, contrary to appellant's suggestion, the challenged testimony did not reveal that he had killed anyone or that he had been convicted of involuntary manslaughter.

Most significantly, defense counsel's objection came *after* appellant had already testified that two people with guns engaged him in an argument when he was unarmed, and he subsequently obtained a gun and shot them.  Our question is therefore whether "it is reasonably probable that a result more favorable to defendant would have occurred in the absence of the admission of the" *additional* testimony about the shooting elicited after counsel's objection.  (*People v. Gabriel* (2012) 206 Cal.App.4th 450, 460.)  The postobjection testimony added only that appellant had served time for the

---

[4] We therefore need not, and do not, decide whether trial counsel was constitutionally ineffective for failing to raise an Evidence Code section 352 objection.

10

shooting, about eight months elapsed between the initial confrontation and appellant's shooting, and nonsignificant details like the two people came looking for appellant at a party on the night he shot them. The testimony following defense counsel's objection was not significantly more prejudicial than the testimony preceding it.[5] For the same reason, we reject appellant's contention that admission of the evidence violated his due process rights. (*People v. Jablonski* (2006) 37 Cal.4th 774, 805 [" 'The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair.' "].)

Appellant also argues the trial court erred in failing to issue a sua sponte limiting instruction directing the jury to consider this testimony only for the limited purpose of assessing appellant's credibility or, in the alternative, his trial counsel was constitutionally ineffective for failing to request such an instruction. The claims fail. Appellant gave the initial testimony about the shooting in response to a question from the prosecutor about why appellant brought a weapon with him on the night in question. Appellant does not contend the prosecutor improperly elicited this testimony or explain why his response to this question or the ensuing line of questions should be limited to assessing his credibility. Even assuming a limiting instruction should have been provided as to the testimony admitted after

---

[5] Appellant does not contend a successful objection would have resulted in striking any of his earlier testimony. We note that appellant's initial statement, that his "first case involved me shooting two people," was highly prejudicial. Appellant provides no argument or authority that trial counsel could have successfully moved to strike this testimony that was responsive to a proper question asked by the prosecutor.

11

counsel's objection, this additional testimony was only minimally prejudicial, as discussed above.[6]

II.    *Lesser Included Offense*

Appellant next argues the trial court erred in failing to sua sponte instruct the jury on the lesser included offense of attempted criminal threats with respect to his conduct against Doe.  We reject the claim.

A trial court has a sua sponte obligation to " ' "giv[e] instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present." ' " (*People v. Perez-Robles* (2023) 95 Cal.App.5th 222, 235.)  "Any error in failing to instruct on a lesser included offense is subject to the harmless error test set forth in *People v. Watson* (1956) 46 Cal.2d 818," whereby "reversal is only required if it appears 'reasonably probable' the defendant would have obtained a more favorable outcome had the jury been properly instructed." (*Ibid.*)

The elements of a criminal threat include "that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' " and "that the threatened person's fear was 'reasonabl[e]' under the circumstances." (*People v. Toledo* (2001) 26 Cal.4th 221, 228.)  If, "for whatever reason, the threat does not *actually* cause the threatened person to be in sustained fear for his or her safety even though, under the circumstances, that person reasonably could have been placed in such fear, the defendant properly may be found to have

---

[6] We also reject appellant's due process claim on this issue.  (*People v. Griggs* (2003) 110 Cal.App.4th 1137, 1143 [United States Supreme Court caselaw "does not establish as a matter of federal constitutional law an entitlement to a sua sponte instruction whenever evidence of a prior conviction is presented"].)

12

committed the offense of attempted criminal threat." (*Id.* at p. 231.)[7] " '[S]ustained' . . . means a period of time that extends beyond what is momentary, fleeting, or transitory." (*People v. Allen* (1995) 33 Cal.App.4th 1149, 1156 (*Allen*).)

Appellant argues the following evidence could support a jury finding that Doe did not actually suffer sustained fear. Appellant did not brandish a weapon when he threatened Doe, nor had he ever used or brandished a gun against her. Appellant argues Doe's credibility was undermined by her testimony that she was afraid of appellant due to his past history of violence, because the violence had occurred in the first year of their relationship. Appellant points to Doe's testimony that she only asked Robert B. to call the police because she wanted the police to diffuse the situation, and that she was more concerned about damage to her car than her own personal safety. Appellant argues any threats occurred when Doe was protected from him by a locked door and the police arrived soon thereafter. Finally, appellant argues Doe's testimony that she was still afraid of appellant at the time of trial was not credible because of the remoteness of his physical violence against her and his compliance with the restraining order she obtained against him.

Even if there was sufficient evidence for the jury to find Doe did not actually suffer sustained fear, it is not reasonably probable the jury would have so found had it been instructed on the lesser included offense. Notably, the verdict demonstrates the jury credited Doe's testimony that appellant threatened both her and Robert B., indicating they found her a believable

---

[7] Contrary to appellant's suggestion otherwise, "the crime of attempted criminal threat requires . . . proof that the intended threat under the circumstances was sufficient to cause a reasonable person to be in sustained fear." (*People v. Chandler* (2014) 60 Cal.4th 508, 511.)

witness. Moreover, Doe knew appellant had a weapon with him that night—the modified screwdriver—and she knew appellant was capable of physical violence against her. (See *Allen*, *supra*, 33 Cal.App.4th at p. 1156 ["The victim's knowledge of defendant's prior conduct is relevant in establishing that the victim was in a state of sustained fear."].)

Appellant's attempts to undermine Doe's testimony about her actual fear do not demonstrate prejudice from any instructional error. Even though appellant's violence against Doe took place years before the threats, Doe testified that she had continued to modify her behavior to appease him, and that his tone that night reminded her of the times when he was physically violent. Doe's desire to have the police diffuse the situation is not inconsistent with her being in fear; moreover, she asked Robert B. to call the police before appellant threatened to kill Robert B. and Doe and her family. As for her testimony that at one point she was more concerned for her car than her own safety, Doe explained that was only because she "wasn't thinking right." Finally, appellant's arguments about the locked door, arrival of the police, and appellant's compliance with the restraining order are unpersuasive. Even if the locked door protected Doe from appellant at the moment he issued the threats, it did not protect her family, whom he also threatened. Some minutes elapsed before police arrived and Doe remained "distraught" after their arrival. Fear may continue after the threat has passed. (See *People v. Culbert* (2013) 218 Cal.App.4th 184, 191 ["Experiencing relief that one has survived is not the same thing . . . as having one's fear evaporate."].) Appellant's compliance with the restraining order to date was no guarantee of his future compliance. This case is easily distinguishable from *In re Ricky T.* (2001) 87 Cal.App.4th 1132, relied on by appellant, in which the Court of Appeal found no sustained fear from a

14

student's threat to "get" a teacher, where the student was unarmed, there was no prior history of conflict between the two, and police were not contacted about the incident until the following day. (*Id.* at pp. 1140, 1138.)

Accordingly, we conclude it is not reasonably probable the jury would have convicted appellant of attempted threats against Doe had it been so instructed.

DISPOSITION

The judgment is affirmed.

SIMONS, ACTING P. J.

WE CONCUR:

BURNS, J.
CHOU, J.

A166840
*People v. Hayter*