Filed 9/19/25  P. v. Topal CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>GARY TOPAL,<br><br>    Defendant and Appellant. | G063958<br><br>(Super. Ct. No. 20HF1040)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Larry Yellin, Judge. Affirmed.

Jared G. Coleman, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Christopher P. Beesley and Caelle Oetting, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

Defendant Gary Topal made numerous angry phone calls for over two years to the Orange County Sheriff's Department (OCSD). In one call, Topal told Captain Jared Dahl "that there had been several shootings recently, and he would hate to see that happen again." On May 28, 2020, Topal called Dahl and told him, "'I will f*cking kill you.'"

In July 2020, the People charged Topal with threatening a public official (a felony), and making harassing and annoying communications (a misdemeanor). A jury later found Topal guilty of the charged crimes. The trial court granted Topal two years of formal probation.

Topal claims that the misdemeanor charge was barred by a one-year statute of limitations. We disagree. The People commenced prosecution by filing a complaint within the one-year limitations period.

Topal also argues the trial court erred by failing to instruct on a lesser included offense (an attempted threat). We disagree. An attempted threat can occur when the intended victim does not reasonably fear for their safety. But at trial, there was undisputed evidence that the intended victim, Captain Dahl, reasonably feared for his safety.

Topal also asks this court to review sealed records to determine if the trial court erred in failing to disclose Captain Dahl's personnel records. We have done so, and we find no errors. Thus, we affirm the judgment.

I.

FACTS AND PROCEDURAL BACKGROUND

In 2017, Topal was involved in an incident with the OCSD. Topal owned some unlicensed trailers that were towed away from his home. At some point during the encounter, Topal charged a sheriff's deputy who stopped Topal by displaying pepper spray. Topal was arrested for obstructing

a peace officer, but the district attorney's office did not file charges. Topal later filed a complaint with the OCSD, and began repeatedly calling Lieutenant Chad Taylor, who was then in the internal affairs division. Topal was upset about how the investigation of his complaint was being handled.

In October 2017, during a call with Lieutenant Taylor, Topal said, "Listen, I don't want to have a Vegas, I don't want to have a Vegas incident, man." [1] Topal later came to the OCSD headquarters in Santa Ana and yelled obscenities at Taylor within the foyer of the building. Taylor perceived Topal as an indirect threat, and referred the matter to a specialized investigation unit. The OCSD issued a "'be on the lookout'" (BOLO) officer safety bulletin regarding Topal "to let the staff know to be careful."

Starting in the beginning of January 2019, Topal repeatedly called OCSD Captain Dahl, who had just begun working out of the sheriff's substation in Lake Forest. The station was in a leased portion of a commercial building with an open parking lot. In his initial call, Topal told Dahl about the 2017 incident involving the trailers. Topal said he had problems with the prior captain (Dubsky) and the prior lieutenant (Valentine). Dahl told Topal that he would investigate the matter.

Captain Dahl spoke to Lieutenant Valentine, who told him that the matter with Topal's trailers had already been taken care of. Valentine said that he had several contacts with Topal, who "was an angry man." Valentine mentioned that Topal had sent "clown wigs" to him and Captain Dubsky. Valentine noted that Dubsky began parking his vehicle in different portions of the Lake Forest parking lot for security reasons. Dahl also spoke

_____

[1] During the trial, the court took "judicial notice of the fact that on October 1st, 2017 there was a mass shooting in the City of Las Vegas at the Route 91 Music Festival."

to Lieutenant Taylor who told him about Topal's earlier outburst in Santa Ana. Dahl further spoke to other OCSD personnel who told him that Topal "was irate and would just fly off the handle. And I was told to be careful."

At the end of January 2019, Dahl told Topal by phone "that there was nothing else that I could do. That [the matter regarding the trailers] had been thoroughly investigated . . . ." Topal's reaction was "very upset. Very enraged." Topal yelled and screamed at Dahl while using profane language.

On July 11, 2019, Topal came to the Lake Forest station, but Dahl was not available.

*The Charged Misdemeanor Conduct* (*July 12, 2019, to May 28, 2020*)

On July 12, 2019, Captain Dahl spoke to Topal on the phone and repeated that there was nothing else that he could do for him. Dahl later testified that Topal "became extremely irate, yelled, screamed, called me several names. [Topal] said that I wasn't helping him out, said that Dubsky hadn't helped him out, and said that Valentine hadn't helped him out." Dahl said: "During the phone call, [Topal] made several statements that had caused me some concern. One of them was to state that he was [an] angry American, he had said that he was a terrorist in action. I tried to ask him, what is a terrorist in action mean? He said he had friends that were terrorists. He said that he had a violent past, or history." Topal told Dahl that "he wanted people to know that he was [being] threatening."

After that phone call, Captain Dahl "was worried. I was worried for the safety of our staff, I was worried for myself. I didn't know what he was capable of or who he was. I didn't know much about him other than what I had read, and what I had read and heard so far wasn't good."

On August 14, 2019, Topal again contacted Captain Dahl. Topal

4

"was extremely upset, extremely irate right off the bat on the phone call." Topal referred to the incident involving the trailers, and "[h]e was again irate, rambling on. Not being clear in what he was looking for. But he threw out a statement in there that there had been several shootings recently, and he would hate to see that happen again." Dahl stated "that I was very aware of four shootings that had just occurred recently, . . . three of them actually within the last couple of weeks in the United States." Dahl asked Topal "whether or not he felt he was going to shoot police officers, or -- or had the intent to kill any of my staff." Topal did not give Dahl a clear response.

A couple of hours later, Topal walked into the lobby of the Lake Forest station. Dahl met Topal face-to-face for the first time and "he was calm when he walked in." Topal had a magazine in his hand, and he opened it "up and said that he wanted me to read a couple of articles within that magazine." Both articles had to do with workplace safety, and one of them specifically talked "'about the importance of training employees to be prepared for active shooting incidents." Dahl told Topal that he interpreted what he was doing as a threat; Topal denied making a threat, "but then he couldn't explain why he brought the article in." Topal said he was familiar with rifles, but he said that he did not own one.

After Topal left the station on August 14, 2019, Captain Dahl described his reaction as: "Apprehensive. I was worried about my safety, worried about my station, my employees' safety. We don't have a lockdown parking facility, so our staff comes in and out of there on a regular basis in their private cars and then they get into their patrol cars and drive. [¶] I clearly had some extreme worries about that, enough to the point to where I have a family and I went home and addressed it with my family. Told them to be aware of the vehicles that [Topal] drove, be aware of him, and then what

5

actions they needed to take -- like, go inside, disengage, leave, run -- whatever if he came by or came around."

Captain Dahl also took additional safety measures at the Lake Forest station. Dahl had various safety items installed in the building including bullet proof glass, lockers near the front of the building with bullet proof vests and shotguns, and an emergency panic button. Dahl warned his deputies, and pursued possible prosecution of Topal, but "I was under the understanding by county counsel and some other people that [Topal] needed to be direct in his threat to me, and not indirect, necessarily."

After the August 14 incident, Topal stopped making routine phone calls to the OCSD. In the first few months of 2020, Topal made a couple of short calls, but none of them were threatening.

*The Charged Felony Conduct* (*May 28, 2020*)

On May 28, 2020, Topal again called Captain Dahl at the Lake Forest Station. Topal was upset and said that Lieutenant Taylor had admitted sending the FBI to his home. Dahl told him that he was not aware of this. Topal then "got very, very upset. Started screaming and yelling. Said that we didn't do anything to help him. That we've been no assistance to him whatsoever."

Topal told Captain Dahl that he was happy that he had been personally responsible for Lieutenant Valentine being fired (Valentine had been promoted). Topal said "that he had always wished that he had beat the sh*t out of [Valentine] . . . and still wishes he could beat the sh*t out of him." Dahl later said that Topal also told him that he "didn't know what he was capable of." Topal then told Dahl: "'I will f*cking kill you.'" After Dahl tried to get Topal to repeat what he had just said, there was dead silence, and then

6

Topal hung up the phone.

After this phone call, Dahl immediately got a hold of a lieutenant and an investigative sergeant who were in a nearby office. Dahl said, "I contacted the investigator immediately. I felt that [Topal] shouldn't be out on the streets. I didn't know what he was capable of or what was going on. So we worked with the investigators and one of our investigative teams to go make an arrest on the crime."

Captain Dahl later testified that "the fact that [Topal] said he was going to kill me, after everything else that had come along, caused me a lot of concern." Dahl testified that the threat upon his life "made me worried. It made me worried for my safety, my family's safety, and the employees that are there. I don't know what he is capable of, as he stated. I don't know much about him besides the little information he's given me. I don't know what his motivations are." Dahl had another BOLO created for the safety of his Lake Forest staff, which he later briefed them on during meetings.

Captain Dahl again took protective measures with his family. Dahl said, "I have three kids and I spent time sitting down with them. I brought in a BOLO. I said, look at this person. Look at the vehicles. The truck, the Camry. If you see him around the neighborhood, around the home -- because this does happen; I've taken classes that are specific to this type of personal officer safety -- then let us know what's going on. [¶] Come in the house, get away from him, tell me right away, call 911 -- whatever you need to do. But don't engage, don't talk, and don't stand there."

Dahl was later asked at trial if he feared for his own safety at that time. Dahl responded, "Absolutely." Dahl then added, "I still worry about him. I don't know what he's capable of or what he's going to do or where he's going to show up."

7

*Court Proceedings*

On July 1, 2020, the People filed a two-count complaint. Count one alleged that on May 28, 2020, Topal committed a felony by threatening a public official. (Pen. Code, § 76, subd. (a).) [2] Count two alleged that between July 12, 2019, and May 28, 2020, Topal committed a misdemeanor by making harassing and annoying communications. (§ 653m (a).)

On December 11, 2020, Topal filed a motion for the discovery of Captain Dahl's personnel records. (See *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).) The trial court conducted an in-camera review of the records, and then denied the *Pitchess* discovery motion.

On September 6, 2022, following a preliminary hearing, the People filed an information alleging the same counts that had been alleged in the earlier complaint.

On November 6, 2023, a five-day jury trial began. Topal testified and admitted that he was aggravated with various members of the OCSD, and that he had used foul language, but he said that he never intended to threaten anyone with violence. Topal said the magazine article about workplace shootings was not what he intended Captain Dahl to read. Topal testified that as far as referencing the Las Vegas shooting incident, he "didn't mean anything with it." Topal denied making the statement to Dahl: "'I'm going to f*cking kill you.'"

During closing arguments, Topal's counsel argued that "the hardest question in this case, I think you'll agree with this, is trying to figure out what's going on inside of Gary Topal's head. This whole case is about one

---

[2] Further undesignated statutory references are to the Penal Code. We shall also omit the word "subdivision" or its abbreviation.

thing. It's about intent. What did he mean?"

The jury found Topal guilty of the charged crimes. The trial court suspended the imposition of a sentence and granted Topal formal probation for two years with various terms and conditions, which included 80 hours of community service, and an anger management course.

## II.

## DISCUSSION

Topal claims: A) a statute of limitations violation; B) the trial court erred by not instructing the jury on the lesser included offense of attempting to threaten a public official; and C) this court should conduct an independent review of a police officer's personnel records.

### A. Statute of Limitations

Topal claims that his misdemeanor conviction for making annoying and harassing communications must be reversed because it was in violation of the statute of limitations. We disagree because the misdemeanor prosecution commenced within one year of the offense.

This is a pure question of law that we review de novo. (See *People v. Brown* (2018) 23 Cal.App.5th 765, 772 ["'application of the statute of limitations on undisputed facts is a purely legal question'"].)

Ordinarily, a prosecution for a misdemeanor crime "shall be commenced within one year after the commission of the offense." (§ 802 (a).) And generally, the "prosecution for an offense is commenced when any of the following occurs: [¶] (a) An indictment or information is filed. [¶] (b) *A complaint is filed charging a misdemeanor* or infraction. [¶] (c) The defendant is arraigned on a complaint that charges the defendant with a felony. [¶] (d)

9

An arrest warrant or bench warrant is issued . . . ." (§ 804, italics added.)

When course-of-conduct offenses are alleged, "the limitations period does not commence as to continuing offenses until the entire course of conduct is complete." (*People v. Keehley* (1987) 193 Cal.App.3d 1381, 1385.)

Here, the People alleged in a complaint that Topal had committed the misdemeanor crime of making harassing and annoying communications "between July 12, 2019, and May 28, 2020." The one-year limitations period for this course-of-conduct offense consequently began on May 28, 2020, and expired on May 28, 2021. The People filed the complaint charging the misdemeanor offense on July 1, 2020, which was well before the expiration of the one-year limitations period; therefore, the People plainly commenced prosecution prior to the expiration of the one-year limitations period.

Thus, we find no violation of the statute of limitations.

Topal argues: "The statute of limitations for this offense had expired on May 28, 2021, more than one year before *the information* was filed on September 6, 2022." (Italics added.)

Topal's argument is somewhat difficult to understand, but he appears to be arguing that the People can only commence the prosecution of a crime within the statute of limitations by filing an information (rather than a complaint). Topal's argument evidently overlooks section 804, which provides that a prosecution can be commenced by *either* the filing of an information, or by the filing a complaint charging a misdemeanor. (See § 804 (a) & (b).)

Again, the People filed a complaint charging a misdemeanor well within the one-year limitations period. Therefore, we reject Topal's claim that there was a violation of the statute of limitations.

*B. Instructional Error Claim*

Topal claims the trial court erred by failing to instruct the jury on its own motion on the lesser included offense of attempting to make a threat against a public official. We disagree because we find that there is not substantial evidence to support the lesser included instruction.

"'On appeal, we review independently the question whether the trial court failed to instruct on a lesser included offense.'" (*People v. Avila* (2009) 46 Cal.4th 680, 704–705.)

A trial court has a sua sponte duty to give the jury "instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present." (*People v. Breverman* (1998) 19 Cal.4th 142, 154–155.) However, this requirement is limited: "the existence of 'any evidence, no matter how weak[,]' will not justify instructions on a lesser included offense. " (*Id.* at p. 162.) A lesser included offense instruction is warranted only if substantial evidence exists from which a reasonable jury "could conclude 'that the lesser offense, but not the greater, was committed.'" (*People v. Avila* (2009) 46 Cal.4th 680, 704–705.)

"Every person who knowingly and willingly threatens the life of, or threatens serious bodily harm to . . . the staff . . . or immediate family of the staff of any elected public official . . . with the specific intent that the statement is to be taken as a threat, and the apparent ability to carry out that threat by any means, is guilty of a public offense . . . ." (§ 76 (a).) The person threatened ordinarily must reasonably fear for his or her safety. (See *Ayala v. Superior Court* (2021) 67 Cal.App.5th 296, 302–303.)

"An attempt to commit a crime consists of two elements: a specific intent to commit the crime, and a direct but ineffectual act done toward its commission." (§ 21a.)

11

An attempted criminal threat is a lesser included offense of making a criminal threat. (*People v. Toledo* (2001) 26 Cal.4th 221, 231.) In *Toledo*, defendant and his wife got into an argument. (*Id*. at pp. 224–225.) At one point, defendant told her, "'You know, death is going to become you tonight. I am going to kill you.'" (*Id*. at p. 225.) Defendant's wife "responded that she did not care, in a manner that indicated she had given up hope, and walked away." (*Ibid*.) Defendant was later convicted of several crimes, including making an *attempted* criminal threat. Defendant argued on appeal that there is no such crime. (*Id*. at p. 226.) The Supreme Court disagreed and held that the offense of making an attempted criminal threat occurs when a defendant acts with the requisite intent, but fortuity prevents the defendant from completing the criminal threat. (*Id*. at p. 231) The Court explained that in this case, defendant made a sufficient threat that was received and understood by the threatened person (defendant's wife), but the threatened person was not actually in sustained fear for her safety. (*Ibid.*)

The facts in *Toledo* are markedly distinguishable from the facts in the instant case. On May 28, 2020, Topal orally communicated to Captain Dahl a specific threat of death: "'I will f*cking kill you.'" Dahl later explicitly testified that he was in immediate fear for his safety based on Topal's threat to kill him. Indeed, Dahl testified that he still had that same fear over two years later at the time of the trial.

Thus, we hold that the trial court did not err by not instructing the jury on its own motion on the lesser included crime of attempting to threaten a public official. This is based primarily on Captain Dahl's undisputed testimony regarding his sustained fear, as well as the corroborative actions he took in response to that fear (hardening the sheriff's station, discussing Topal's threat with his family members, etc.). There is

12

simply no evidence to support the lesser included instruction.

Topal argues "there was evidence that reasonably supported the conclusion that . . . Dahl's fear was not actual or not objectively reasonable." We disagree. Given Topal's repeated references to mass shootings, and the article he gave to Captain Dahl regarding active shooters, we do not think that any juror could rationally find that Dahl's fear was not objectively reasonable. Indeed, this argument was never raised at trial. (See *People v. Chandler* (2014) 60 Cal.4th 508, 525–526 [holding that no reasonable juror could find the defendant's threats insufficient to cause a reasonable person to be in sustained fear when "the defense theory at trial did not contest the reasonableness of the victim's fear"].)

In any event, even if we found instructional error, we would not find the error to be prejudicial.

Generally, "error in failing sua sponte to instruct, or to instruct fully, on all lesser included offenses and theories thereof which are supported by the evidence must be reviewed for prejudice exclusively under [*People v.*] *Watson* [(1956) 46 Cal.2d 818, 836]." (*People v. Breverman, supra,* 19 Cal.4th at p. 178.) Under the *Watson* test for prejudice, "a defendant must show it is reasonably probable a more favorable result would have been obtained absent the error.'" (*People v. Beltran* (2013) 56 Cal.4th 935, 955.)

"[T]he *Watson* test for harmless error 'focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected

13

the result.'" (*People v. Beltran, supra,* 56 Cal.4th at p. 956.)

Here, there was overwhelmingly strong evidence that Captain Dahl was in sustained fear, which was reasonably based on Topal's direct threat to kill Dahl on May 28, 2020, as well as Topal's conduct in the preceding two years. In sum, had the jury been instructed on the lesser included offense of an attempted threat of a public official, we do not find that "'it is reasonably probable a more favorable result would have been obtained absent the error.'" (*People v. Beltran, supra,* 56 Cal.4th at p. 955.)

*C. Motion for the Discovery of Captain Dahl's Personnel Records*

A defendant may file a discovery motion seeking the confidential personnel file of a peace officer. (See *Pitchess, supra,* 11 Cal.3d 531.) If a trial court finds good cause, the court must then hold an in camera hearing to review all potentially relevant documents. (Evid. Code, §1045 (b).) If the court conducts an in camera review, but then denies the *Pitchess* motion for the disclosure of the materials, a reviewing court may later independently review the records. (*People v. Mooc* (2001) 26 Cal.4th 1216, 1232.)

A trial court has broad discretion in ruling on both the good cause and disclosure components of a *Pitchess* motion, and its ruling will not be disturbed on appeal absent an abuse of that discretion. (*Alford v. Superior Court* (2003) 29 Cal.4th 1033, 1039.)

Here, a sealed transcript of the in camera hearing was made part of the appellate record. After reviewing that transcript, we conclude that the trial court did not abuse its discretion in refusing to disclose the contents of Captain Dahl's personnel file.

## III.

## DISPOSITION

The judgment is affirmed.

MOORE, ACTING P. J.

WE CONCUR:

SANCHEZ, J.

BANCROFT, J.*

*Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.